UNITED STATES of America, Appellee,

v.

BEN M. HOGAN CO., INC., Appellant.

No. 84–1757.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1984.

Decided July 25, 1985.

Rehearing and Rehearing En Banc Denied Sept. 20, 1985.

Before BRIGHT, Senior Circuit Judge, and McMILLIAN and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Defendant Ben M. Hogan Company, Inc. (Hogan), a corporation engaged in the business of highway construction, was indicted by a grand jury on one count of conspiring to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1, and on three associated counts of mail fraud under 18 U.S.C. § 1341. Hogan was found guilty on all counts charged in the indictment. The District Court fined Hogan $800,000 on the Sherman Act count (Count One) and $1,000 each on the mail fraud counts (Counts Two through Four). Hogan appealed. We reverse Hogan's conviction on Count One and remand this case to the District Court for a new trial on Count One. We affirm Hogan's convictions on Counts Two through Four.

The theory upon which Hogan was prosecuted was, in essence, that between May 1979 and September 1980, Hogan conspired with A.P.T. Construction Company, Inc. (A.P.T.)[1] to allocate between themselves, through the submission of rigged bids, work contracts for certain state highway construction projects.[2] The government's principal witness, Leonard Thompson, president of A.P.T., testified that at the request of William Moore, vice president of Hogan, he agreed in May 1979 to submit a complementary bid, i.e., a higher bid than the bid Hogan planned to submit, on project 60173. Two bids were submitted on project 60173, one from Hogan and one from A.P.T. Hogan's bid was the lower and Hogan was

Robert V. Light, Little Rock, Ark., and Richard J. Braun, Nashville, Tenn., for appellant.

Frederic Freilicher, Washington, D.C., for appellee.

1. A.P.T. was charged in the same indictment with the same offenses as was Hogan. Prior to trial, A.P.T. pleaded guilty to Counts One and Two and agreed to cooperate with the government in its investigation. In return, the government agreed to dismiss Counts Three and Four, to recommend that A.P.T. be fined $150,000, and not to prosecute A.P.T. further for any prior act of bid rigging.

2. State highway projects are authorized by a highway commission and specifications for the projects are drawn by the Arkansas State Highway and Transportation Department. A public bidding process is employed in awarding contracts for the work to be done on these projects: a public announcement of a project for which a contract is to be awarded is made; a bid proposal form is requested by interested contractors; a list of contractors that have requested a proposal form is made public; completed proposal forms, which include a statement to be signed by the bidder that the proposal is made without collusion, are submitted; and a public bid letting is held. Thereafter, the contract generally is awarded to the lowest bidder. The state encourages competitive bidding and prefers not to award a contract on the basis of a single bid.

awarded the contract. According to Thompson, in exchange for A.P.T.'s complementary bid on project 60173, Moore promised to return the favor in the future.

Thompson testified that in July 1980, he telephoned Moore with a request that Hogan bid in excess of the amount A.P.T. planned to bid on project 60179, and that Moore agreed to do so. Thompson also testified that he was able to make a similar arrangement regarding project 60179 with Jack Freshour, president of Freshour Construction Company (Freshour Construction).[3] A.P.T., Hogan, and Freshour Construction bid on project 60179. The contract on project 60179 was awarded to A.P.T., which proved to be the low bidder.

Thompson further testified that in September 1980, he telephoned Moore with a request that Hogan bid in excess of the bid A.P.T. planned to submit on project 60234 and that Moore agreed to do so. Thompson testified that when he made the same request of Freshour, Freshour told him that Freshour Construction did not intend to bid on project 60234. Hogan and A.P.T. were the only bidders on project 60234. A.P.T. was the low bidder and was awarded the contract on project 60234.

Thompson's testimony was contradicted by several witnesses. Moore acknowledged that he had had conversations with Thompson concerning projects 60173 and 60234 but denied entering into any agreements with Thompson to rig bids. Freshour testified that he never discussed making complementary bids with Thompson or anyone else. Freshour's wife testified that she had never encountered Thompson, while Thompson's testimony suggests that she had been present on one occasion when he claims to have met with Freshour at the Freshour residence.

Hogan's bid estimator and its asphalt plant superintendent testified that they

never had been instructed to keep a bid above any particular amount, and that, in fact, they had standing instructions to update bids with price reductions if a downward price fluctuation during the pendency of a bid made it feasible to do so. Freshour Construction's bid estimator testified that he cut the profit margin on his company's bid on project 60179 in an effort to secure the contract.

Others eligible to bid on the projects in question testified that they were not contacted regarding the bidding on the projects alleged by Thompson to have been rigged. Thompson, however, testified that it was unnecessary to contact other bid proposal holders because their plants were located so far from the project sites that it would have been impossible from the standpoint of transportation costs for them to have underbid.

■ For reversal, Hogan argues that the District Court improperly instructed the jury regarding the interstate commerce element of the Sherman Act violation charged in Count One of the indictment. We agree, and we therefore reverse Hogan's conviction on Count One and remand this case to the District Court for a new trial on Count One.[4]

Hogan also makes a number of other claims, all of which we have carefully considered and have found to be without merit. We will, however, discuss Hogan's additional claims to the extent that they are not resolved by our reversal for instructional error on Count One.

## I.

The District Court correctly characterized this case as one concerning acts which, if proved, are deemed per se unreasonable under the Sherman Act. Having done so, the court instructed the jury that:

---

**3.** There is no indication in the record of any proceedings against Freshour Construction.

**4.** While an effect on interstate commerce is an element of the Sherman Act violation charged in Count One, it is not an element of the mail fraud violations charged in Counts Two through

Four. Therefore the instructional error regarding interstate commerce did not prejudice Hogan with respect to Counts Two through Four, on which the District Court gave separate instructions.

Certain types of conduct are regarded as unreasonable per se. This means that the mere doing of the act itself constitutes an unreasonable restraint on *interstate* commerce, and it is not necessary to consider why the acts were committed, or their effect on the industry, or any other explanatory matter. Conduct regarded as unreasonable per se includes price fixing, division of markets and bid rigging.

Trial Transcript (Tr.) at 492 [hereinafter referred to as per se instruction] (emphasis added).[5] Hogan argues (1) that the per se instruction informed the jury that if it found Hogan's actions constituted bid rigging, it could convict Hogan without considering whether the government had proved that Hogan's actions had an effect on interstate commerce; (2) that the per se instruction created a conclusive presumption of an effect on interstate commerce; and (3) that the government thereby was unconstitutionally relieved of its burden of proving every element of its Sherman Act case.

"A conclusive presumption removes the presumed element from the case once the [government] has proven the predicate facts giving rise to the presumption." *Francis v. Franklin*, — U.S. ——, 105 S.Ct. 1965, 1971 n. 2, 85 L.Ed.2d 344 (1985). The Supreme Court has found conclusive presumptions in criminal instructions to " 'conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime,' and [to] 'invade [the] factfinding function' which in a criminal case the law assigns solely to the jury." *Sandstrom v. Montana*, 442 U.S. 510, 523, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979) (quoting *Morissette v. United States*, 342 U.S. 246, 275, 72 S.Ct. 240, 256, 96 L.Ed. 288 (1952) and *United States v. United States Gypsum Co.*, 438 U.S. 422, 446, 98 S.Ct. 2864, 2878, 57 L.Ed.2d 854 (1978)).

We have examined the per se instruction and we conclude that it could have been understood by the jury to include an unconstitutional conclusive presumption of an effect on interstate commerce. We are convinced that the District Court did not intend to create such a situation; immediately prior to giving its per se instruction, the District Court gave a correct instruction on the interstate commerce element and on the government's burden of proof regarding that element. The per se instruction, however, contradicts the court's careful instruction on interstate commerce as a separate element of the Sherman Act offense. "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching [a] verdict." 105 S.Ct. at 1975.[6]

---

5. Hogan made a timely, specific objection to the instruction here at issue. The District Court denied the objection.

> [COUNSEL]: I object [to the government's per se instruction] on the grounds that it violates Sandstrom v. Montana in two respects. One is that the jury is instructed to presume that interstate commerce can be found from the mere doing of an act, which takes the interstate commerce issue away from the jury. That issue, Your Honor, has never been raised before. There are no cases on it. But I think there is a serious Sandstrom problem in taking—it would essentially relieve the government from its obligation of proving interstate commerce from the mere doing of an act. And I think there is a real problem with that instruction in that regard.
> THE COURT: All right. That will be denied.

Tr. at 394.

6. Contrary to the implication left by the dissent, nowhere in the District Court's instructions was the jury told it *had* to find that Hogan's business affected interstate commerce *before* it considered the per se instruction. If the instructions truly had required such a course of action, we would agree that Hogan's conviction on Count One could be affirmed. In actuality, however, the detailed instructions pertaining to an effect on interstate commerce were followed immediately by the per se instruction, which told the jury that the mere doing of the act, *i.e.*, bid rigging, by itself constituted an unreasonable restraint on *interstate* commerce. The District Court gave no indication whatsoever that the issues addressed in the per se instruction were separable from those addressed in the immediately preceding sentences. *See* Tr. at 491–92. We do not wish any more than the dissent to see a convicted criminal "escape[ ] just punishment." *Infra* at 1304. But convictions must

If ever there could be a case where the giving of a jury instruction that included a conclusive presumption concerning an element of a crime amounted to harmless error, this would be the case, for in the record before us there appears to be ample evidence from which the jury could have found—and perhaps did find—that the element was proved. But where "[t]he conclusive presumption the jury was instructed to apply permit[s] the jury to convict [the defendant] without ever examining the evidence concerning an element of the crime[ ] charged," a plurality of the Supreme Court has held that "[s]uch an error deprive[s the defendant] of 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" *Connecticut v. Johnson,* 460 U.S. 73, 87–88, 103 S.Ct. 969, 977–978, 74 L.Ed.2d 823 (1983) (quoting *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)). While the *Connecticut v. Johnson* plurality did not hold that "instructional error of constitutional dimensions may never be harmless," it did counsel that not every "form of instructional error should be analyzed for harmlessness." *Id.* 460 U.S. at 83, 103 S.Ct. at 976. Though the substantive issue of the flawed instruction in *Connecticut v. Johnson* was the critical issue of criminal intent, rather than the issue of an interstate effect on commerce, the form of the instruction clearly was that of a conclusive presumption. And the plurality's summary of its holding, *see id.* at 87–88, 103 S.Ct. at 977–978, indicates that it was the conclusive form of the instruction, more than the particular element of the crime to which the

instruction pertained, that was of concern to the plurality.

Accordingly, we hold that by including the word "interstate" before the word "commerce" in its per se instruction, the District Court committed reversible error.[7] We therefore reverse Hogan's conviction on Count One, the only count to which the per se instruction related, and remand this case for a new trial on Count One.

## II.

■ Hogan claims that it is entitled to reversal of its convictions on all counts of the indictment due to the government's failure to make available to it in a timely fashion certain notes taken by government attorneys during pretrial interviews of Thompson, Moore, and Mrs. Freshour. We disagree.

The Freshour notes were disclosed to Hogan during trial. On appeal, this Court reviewed *in camera* the Thompson and Moore notes and ordered them disclosed to Hogan in their entirety, with directions that Hogan file a supplemental brief to explain further its position regarding the interview notes. Having considered Hogan's arguments concerning the notes, we hold that Hogan was not prejudiced by their previous unavailability.

### A.

■ The Supreme Court held in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to

---

be achieved in a just fashion. When instructions are given that, read as a whole, reasonably can be understood to contain a conclusive presumption concerning an element of the crime charged, the possibility exists that a jury could return a guilty verdict without first finding that every element of the crime has been proved beyond a reasonable doubt. Instructions that create such a possibility make it impossible for a reviewing court to conclude that the defendant has been convicted in a manner that satisfies due process.

7. In giving its per se instruction, we believe the District Court's wisest course of action would have been to use the word "trade" in place of the words "interstate commerce." *See generally* E. Devitt and C. Blackmar, *Federal Jury Practice and Instructions* § 55.15 (3d ed. 1977), although if the District Court had omitted the word "interstate" at the particular place in the per se instruction where it appears, Hogan's claim would be, in our view, without substance. *Cf. United States v. Koppers Company,* 652 F.2d 290, 293 (2nd Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981).

guilt or to punishment." *Id.* at 87, 83 S.Ct. at 1196. In *Brady*, the prosecutor had failed to disclose exculpatory evidence. Hogan makes no plausible claim that the interview notes contain exculpatory material.[8] Rather, Hogan claims that the Thompson and Freshour notes were valuable to its defense for the purpose of impeaching the credibility of Thompson, the government's principle witness. As a recent Supreme Court case explicitly recognizes, however, impeachment evidence can be "favorable to an accused"; "[i]mpeachment evidence, ... as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley,* —— U.S. ——, ——, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (U.S. July 2, 1985). Accordingly, if either exculpatory or impeachment evidence is suppressed by the prosecution, and if the evidence is material, reversal is warranted.

In cases decided by this Court prior to the Supreme Court's decision in *United States v. Bagley,*

> [w]hether evidence [was] sufficiently material to require its disclosure ... [was] determined by initially considering whether the defense made a 'specific' or merely a 'general' request for its disclosure prior to trial. If a specific request was made, evidence [was] deemed material, and a reversal warranted, if disclosure of the evidence 'might have affected

the outcome of the trial.' If only a general request was made, evidence [was] considered material only if it 'created a reasonable doubt that did not otherwise exist [when] evaluated in the context of the entire record.'

*Scurr v. Niccum,* 620 F.2d 186, 189 (8th Cir.1980) (quoting *United States v. Agurs,* 427 U.S. 97, 104, 112, 96 S.Ct. 2392, 2397, 2402, 49 L.Ed.2d 342 (1976)). A majority of the Supreme Court now seems to agree that irrespective of the specificity of a request for evidence made by the defense, for purposes of a *Brady* inquiry such "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[9] —— U.S. at ——, 105 S.Ct. at 3383.

We have carefully considered Hogan's claims that it could have used the Thompson and Freshour interview notes to impeach Thompson's credibility at trial and find that Hogan is not entitled to relief under the aegis of *Brady*. There is not a reasonable probability that the result of Hogan's trial would have been different had the notes been disclosed. The government's failure to produce these notes does not "undermine confidence in the outcome of [Hogan's] trial."[10] *Id.* at ——, 105 S.Ct. at 3381.

---

**8.** We reject an attempt by Hogan to characterize the interview notes as potentially exculpatory merely because they do not contain the exact inculpatory phraseology Hogan thought they might.

**9.** This "reasonable probability" standard of materiality is taken from Part III of Justice Blackmun's opinion in *United States v. Bagley.* Only Justice O'Connor joined in Part III of Justice Blackmun's opinion. Justice White, however, in a concurring opinion joined by The Chief Justice and Justice Rehnquist, approvingly quoted the "reasonable probability" standard of materiality found in Part III of Justice Blackmun's opinion. Justice Blackmun finds this standard "sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused," but he additionally addresses how reviewing courts should consider the specificity of the defense's request for evidence in making determinations of materiality under the "reasonable probability" standard.

—— U.S. at ——, 105 S.Ct. at 3384. Justice White agrees that the standard "is 'sufficiently flexible' to cover all instances of prosecutorial failure to disclose such evidence," but "see[s] no reason to attempt to elaborate on the relevance to the [materiality] inquiry of the specificity of the defense's request for disclosure...." *Id.*

**10.** Hogan similarly claims that it is entitled to relief under *Brady* because the Moore interview notes could have been used to rehabilitate Moore's trial testimony. This argument is meritless. The government did not attempt to impeach Moore's testimony regarding the issue on which Hogan claims the notes could have been used for rehabilitation. Absent impeachment, there is no basis for rehabilitation. Moreover, even assuming that material such as the Moore notes could be deemed favorable to the accused under *Brady,* it is hard to imagine a situation where evidence claimed to be of value to the defense solely for the purpose of bolstering a witness's favorable, unimpeached testimony will

### B.

Under the Jencks Act, 18 U.S.C. § 3500, when a witness testifies for the government in a criminal prosecution, the government may, upon request by the defendant and following the witness's direct testimony, be required to produce any statement of the witness which relates to the witness's trial testimony. Hogan made a pretrial request for, and the government voluntarily agreed to produce five days prior to trial, any Jencks Act material in the government's possession. On appeal, Hogan raises a Jencks Act claim. Because this claim seems to be focused upon the Thompson notes, we will discuss it in the context of those notes.

The government apparently concluded that the Thompson notes were not Jencks Act material and did not produce them in advance of trial. When Hogan became aware of the Thompson notes at trial, it moved for their production. The District Court reviewed the Thompson notes *in camera*, and pursuant to the Jencks Act, ordered extrapolated from the notes and disclosed to Hogan scattered sentences and phrases within the notes that were enclosed in quotation marks. Hogan in fact did not receive this material until after both sides had rested in the presentation of their cases. Hogan now argues that it was prejudiced by the government's failure to make timely disclosure of Jencks Act material.

"Although in many cases the government freely discloses Jencks Act material to the defense in advance of trial, the government may not be required to do so." *United States v. White*, 750 F.2d 726, 729 (8th Cir.1984). But when disclosure is ultimately required, it must be made before it is too late for the material to be put to any effective use. We need not address the timeliness of the disclosure in this case because the Thompson notes in their entirety do not as a matter of law constitute

Jencks Act material and because Hogan waived any claim it may have had regarding those portions of the Thompson notes ordered disclosed by the District Court.

The Jencks Act, in relevant part, defines a statement as "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by [a] witness and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e)(2).

■ Plainly, the Thompson notes when viewed in their entirety do not constitute Jencks Act materials because they are not statements within the meaning of the Jencks Act. *See United States v. Cuesta*, 597 F.2d 903 (5th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 451, 62 L.Ed.2d 377 (1979) (investigators' notes of interviews do not fall under the Jencks Act even if they contain occasional verbatim recitations of phrases of interviewee). As recognized by Justice Powell, "the fact that counsel usually will take notes does not mean that the notes often will be 'statements.' Counsel rarely take down verbatim what witnesses say in these preparatory conferences. Consequently, prosecutors' notes may be expected to meet the requirements of [18 U.S.C. § 3500(e)(2) ] very infrequently." *Goldberg v. United States*, 425 U.S. 94, 122 n. 9, 96 S.Ct. 1338, 1353 n. 9, 47 L.Ed.2d 603 (1976) (Powell, J., concurring in judgment).[11]

■ While the District Court did not find that the Thompson notes in their entirety constituted Jencks Act material, it did direct, pursuant to the Jencks Act, that several sentences and phrases enclosed in quotation marks be extracted and given to Hogan. Certainly the District Court was not required to order disclosed as Jencks Act material a few scattered sentences and phrases it found in a body of otherwise non-Jencks Act, attorneys' rough interview

---

satisfy the "reasonable probability" standard of materiality. In any event, in this case the Moore notes do not satisfy that standard.

11. Likewise, the Moore and Freshour notes in their entirety do not constitute Jencks Act materials and Hogan therefore has no viable Jencks Act claim with respect to them.

notes. In fact, we believe that a trial court ought not employ such a process of extrapolation unless the particular circumstances of a case are extremely compelling. In our view, it is doubtful that the circumstances of this case can fairly be characterized as compelling.[12] We decline, however, to determine whether or not the District Court erred in ordering portions of the Thompson notes disclosed. *Cf. Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501 (1963) (determination by district court of producibility under the Jencks Act may not be disturbed unless clearly erroneous). Regardless of the propriety of the District Court's actions, Hogan waived any Jencks Act claim it may have had regarding the Thompson note extrapolations.

■ The District Court first ordered the government to disclose portions of the Thompson notes at 1:30 p.m. on May 7, 1984 during an in-chambers conference with counsel.[13] *See* Tr. at 251. On the morning of May 8, 1984, Hogan rested its case, in spite of the fact and without mentioning to the court that it had not received the material the court ordered disclosed to it on May 7. During the instruction conference, on the afternoon of May 8, 1984, Hogan then complained that it had not received the material. The District Court ruled that Hogan had waived its right to this material by its failure to alert the court to the matter prior to resting its case. The court reasoned that it had no way of knowing that the government had not complied with the court's order and that instead of voluntarily resting its case, Hogan should have requested some time to receive and review the material in order to make a determination as to whether it wished to present additional evidence. *See* Tr. at 410–11. We hold that the District Court correctly found Hogan's actions to constitute a waiver.

## C.

Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure requires the government, upon request of a defendant, to disclose relevant written or recorded statements of the defendant, as well as the substance of any oral statement made by the defendant in response to interrogation by any person then known by the defendant to be a government agent, which the government intends to offer in evidence at trial. Hogan made a broadly-phrased, pretrial request for production under Rule 16(a)(1)(A). Also prior to trial, Hogan protested to the court that counsel for Moore had informed Hogan that the government possessed notes taken by government attorneys at the time they interviewed Moore and requested that the court order the Moore notes produced. The District Court never explicitly granted or denied this request, but ruled that the discovery proposal of the government, which did not include production of the Moore notes, was acceptable. Hogan now claims that it should have been provided with the Moore notes pursuant to Rule 16(a)(1)(A).

■ Assuming *arguendo* that the Moore notes should have been disclosed to Hogan under Rule 16(a)(1)(A), we hold that the non-disclosure of these notes is not a ground for reversal because Hogan's substantial rights were not thereby prejudiced. *See United States v. Bledsoe*, 674 F.2d 647, 670 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). As we already have concluded, it is not reasonably probable that the result of the trial would have been different had the Moore notes been disclosed.

## III.

■ Hogan claims there was a substantial variance between the single conspiracy charged in the indictment, as voluntarily

---

**12.** The District Court acknowledged that it acted as it did "out of an abundance of caution" and that it might have "stretch[ed] it a little far" by giving Hogan any portion of the Thompson notes. Tr. at 251, 252.

**13.** The written order was dated May 7, 1984 and was filed with the court clerk on May 8, 1984.

clarified prior to trial by the government, and the proof at trial. We reject this claim.

■ The indictment charged Hogan with a single conspiracy to rig bids on an unspecified number of highway projects in central Arkansas. Although a formal bill of particulars was never ordered, the government filed a voluntary disclosure two months before trial, specifying three projects on which Hogan was believed to have participated in bid rigging and defined "central Arkansas" as Pulaski County and its adjacent counties. The voluntary disclosure also referred to two to four other unspecified projects on which bids purportedly were rigged with Hogan's cooperation. Hogan contends that it thus was charged with a massive conspiracy to rig five to seven bids on projects in a multi-county area, while the proof adduced at trial related to only three bids on projects in a single county.[14]

Clearly Hogan was, on the basis of the indictment and the government's voluntary disclosure, notified well in advance of trial that it was charged with rigging bids on the three Pulaski County projects to which the proof at trial related, and Hogan had every opportunity to plead to and defend against those charges. The indictment charged Hogan with conspiring to rig bids in violation of the Sherman Act; that charge was not changed by the government's voluntary disclosure and, subject to the interstate commerce problem discussed in Part I of this opinion, was proved at trial. The violation shown was merely narrower than the violation charged. Under these circumstances, Hogan was not prejudiced. *See United States v. Miller,* — U.S. ——, 105 S.Ct. 1811, 1814–16, 85 L.Ed.2d 99 (1985).[15]

## IV.

■ Hogan claims that it was prejudiced by the introduction at trial of A.P.T.'s guilty plea. *See supra* note 2. Government counsel informed the District Court that it anticipated use by defense counsel of A.P.T.'s guilty plea to impeach Thompson's credibility and proposed that it first be allowed to bring to the jury's attention the matter of A.P.T.'s guilty plea. Tr. at 112, 147–49. Defense counsel objected generally to this course of action, Tr. at 114, but in no way denied that counsel intended to use the guilty plea to attack Thompson's credibility. The District Court

---

**14.** Hogan makes a related argument that the proof established separate bid rigging conspiracies, rather than the single conspiracy with which Hogan was charged. There is, however, substantial evidence in the record from which a jury reasonably could find a single, overall conspiracy concerning projects 60173, 60179, and 60234. Such a conclusion is not undermined by the fact that there was evidence of multiple sub-conspiracies, *i.e.*, of the agreements made at the time of each of the three bid lettings, constituting objects of the overall conspiracy. *See Koolish v. United States,* 340 F.2d 513, 525 (8th Cir.), *cert. denied,* 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965). And, contrary to Hogan's assertions, a single conspiracy is not transformed into multiple ones merely by the lapse of time. *United States v. Vila,* 599 F.2d 21, 24 (2nd Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

**15.** We also are unpersuaded by Hogan's alternative claim that it was prejudiced by Thompson's explanation of Freshour's willingness to submit a complementary bid on project 60179; Thompson testified that because he had agreed, at Freshour's request, to submit complementary bids on two projects in April 1979, Freshour was willing to do so on project 60179. Hogan argues that reference to these April 1979 projects fixes commencement of the conspiracy at a point preceding Hogan's involvement in May 1979 and thus, that the proof at trial was of a conspiracy broader than that charged. Thompson's explanation first was elicited by Hogan on cross-examination and was consistent with Thompson's grand jury testimony, a copy of which had been provided to Hogan in advance of trial. Hogan cannot seriously claim prejudice on the basis of an answer to a question which it asked solely to challenge Thompson's credibility and which exceeded the scope of direct examination, especially when Hogan, based on the availability of Thompson's grand jury testimony, must have known what answer Thompson likely would give. Furthermore, any evidence of a conspiracy in April 1979 would have no bearing whatsoever upon Hogan; Thompson did not implicate Hogan with respect to the April 1979 projects, he spoke only of an agreement between A.P.T. and Freshour Construction. Therefore, Hogan was not required at trial to defend against any charge that it had not been informed of by the indictment.

ruled that government counsel would be permitted to introduce the fact of A.P.T.'s guilty plea during its direct examination of Thompson.

The following cautionary instruction was given before Thompson testified concerning the guilty plea:

> [E]vidence of a witness's own guilty plea, that is, Mr. Thompson for A.P.T. Company, cannot be used except to assess the credibility of the witness and also as an acknowledgment of the witness's participation in the offense charged, but it cannot be considered as substantive evidence of the defendant Ben Hogan Company's guilt, and no inference of guilt as to the Ben Hogan Company can be inferred from A.P.T.'s plea.

Thompson Transcript at 3. Government counsel then questioned Thompson briefly to establish the fact that A.P.T. had pleaded guilty. On cross-examination, in an obvious attempt to impeach Thompson's credibility, counsel for Hogan questioned Thompson extensively about A.P.T.'s guilty plea. *Id.* at 51–54. In its formal charge to the jury, the District Court again explicitly cautioned the jury that evidence of A.P.T.'s guilty plea could be used only in assessing Thompson's credibility and not in determining Hogan's guilt or innocence. *See* Tr. at 472–73.

> Evidence that [a co-defendant] entered a plea of guilty to the same offense is not error unless it is elicited as substantive proof of the defendant's guilt. Where it is introduced for other purposes, such as to impeach, to reflect on a witness' credibility, or to show the witness' acknowledgment of participation in the offense, evidence of a co-defendant's guilty plea is clearly admissible. In such circumstances, the trial judge should instruct the jury that the evidence is received for this purpose alone and that the plea cannot form the basis of any inference as to the guilt of the defendant.

*United States v. Wiesle,* 542 F.2d 61, 62 (8th Cir.1976); *cf. Wallace v. Lockhart,* 701 F.2d 719, 725–26 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983) (relying on *United States v. Wiesle* ) (co-defendant's prior conviction introduced to show acknowledgment of participation in the crime); *United States v. Basic Construction Company,* 711 F.2d 570, 574 (4th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 371, 527, 78 L.Ed.2d 330 (1983) (given the court's cautionary instruction, no error for court to tell jury of co-defendants' nolo contendere pleas although it is better to simply tell jury that cases of co-defendants had been disposed of without saying how).

We find the introduction of the guilty plea in this case to have been in keeping with *United States v. Wiesle* and thus within the District Court's discretion. The jury's use of the plea was carefully limited by the District Court to assessment of Thompson's credibility and to A.P.T.'s acknowledgment that Thompson participated in the offense charged. We need not hold the introduction of the plea improper merely because it first was injected into the case by the government on direct examination of Thompson. *Cf. United States v. Koppers Company,* 652 F.2d 290, 299 (2nd Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981) (references to report which revealed that government's principal witnesses had perjured themselves in early phases of investigation of rigged road construction bids were properly elicited by government on direct examination to anticipate attempts by defense counsel to attack witnesses' credibility). Hogan's claim of prejudice is further eroded by the fact that Hogan's counsel made extensive use of the plea on cross-examination in an attempt to impeach Thompson's testimony. *Cf. id.; United States v. Schmaltz,* 562 F.2d 558, 560 (8th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 315 (1977) (where co-defendant pleaded guilty after jury was impaneled and court, without giving a cautionary instruction, informed jury that co-defendant's case had been resolved, defendant suffered no substantial prejudice, especially since defense counsel called co-defendant to the stand and extensively examined him regarding the guilty plea).

## V.

Hogan makes additional challenges to the jury instructions given by the District Court, as well as to the District Court's refusal to give two particular instructions proposed by Hogan. We have examined the charge to the jury as a whole and find that Hogan's remaining challenges to the court's instructions are meritless. We also find that the District Court did not abuse its discretion in refusing to instruct the jury as requested by Hogan. Similarly, we reject Hogan's claims of error regarding various other discovery and evidentiary matters. Our review discloses that these matters were entirely within the District Court's soundly exercised discretion.

## VI.

Finally, Hogan claims that government counsel improperly injected government counsel's credibility into the trial and misstated the evidence. We have considered these claims and find them to be without merit. However, we caution government counsel on retrial to avoid making statements that could be construed as an injection into the trial of government counsel's credibility or statements of the evidence that are not faithfully accurate. While we do not wish to discourage spirited advocacy, prosecutorial misconduct is a serious matter, and this Court will not allow actual instances of such misconduct to go unremedied.

## VII.

With respect to Hogan's conviction on Count One, the judgment of the District Court is reversed and this case is remanded to the District Court for a new trial. With respect to Hogan's convictions on Counts Two through Four, the judgment of the District Court is affirmed.

McMILLIAN, Circuit Judge, concurring.

I concur in the decision to reverse and remand for new trial appellant's conviction for conspiracy to restrain trade in violation of the Sherman Act (count 1) by submitting rigged bids for certain state highway con-struction projects. I agree that the instruction describing the types of conduct considered unreasonable per se under the Sherman Act contained a conclusive presumption of an effect on interstate commerce which improperly removed that element of the offense from the consideration of the jury. *See* Part I *supra*. I also concur in the analysis in Parts II (government nondisclosure of exculpatory material and statements of the defendant), III (variance), V (instructions and other discovery and evidentiary matters), and VI (prosecutorial misconduct).

With respect to Part IV, I acknowledge that the analysis therein of the anticipatory introduction of APT's guilty plea is consistent with the position set forth for this Circuit in *United States v. Wiesle*, 542 F.2d 61, 62 (8th Cir.1976). I write separately only to restate my belief that the better rule is to not "allow the government to introduce evidence as part of its case-in-chief that a codefendant had pleaded guilty to the same or similar offense with which the defendant is charged." *United States v. Hutchings*, 751 F.2d 230, 239 (8th Cir. 1984) (McMillian, J., specially concurring).

Finally, I note that although the conspiracy to restrain trade count, for which conviction the district court had imposed a substantial fine in the amount of $800,000, has been reversed and remanded for new trial, the court has today affirmed appellant's conviction for three counts of mail fraud in connection with the state highway construction bid-rigging scheme. The district court imposed a fine of $1,000 on each of the mail fraud counts. This is the maximum fine that the district court could have imposed for the offense of mail fraud. *See* 18 U.S.C. § 1341. Mail fraud may also be punished by imprisonment for not more than five years. It is, of course, impossible to imprison the corporation itself; it would not, however, be impossible to imprison, following investigation, indictment, trial, and conviction, those corporate officers or employees who acted unlawfully on behalf of the corporation. We have often observed that a corporation cannot take ac-

tion itself but must act through persons. In my view, it is time to reexamine the prosecution and punishment of corporate crime and to focus upon not only the wrongdoing of the corporate entity but also upon that of its human actors.

BRIGHT, Senior Circuit Judge, dissenting.

After a lengthy trial, a corporation found guilty of bid rigging escapes just punishment on grounds that the trial court erred in instructing the jury. I must dissent. A reading of the instructions as a whole discloses no error at all, for the experienced and able trial judge fully explained the interstate commerce element necessary to convict.

1) The recitations of the indictment indicated the necessity for proof of conduct restraining interstate commerce. The trial court instructed, with regard to the indictment:

In Count One the defendants are charged with having engaged, from sometime in or about May, 1979 to about September, 1980 in a combination and conspiracy in unreasonable restraint of certain interstate trade and commerce * * *.

2) The court explicitly stated that, as one element of the offense charged, the conspiracy must affect interstate commerce:

Three elements are required to be proved beyond a reasonable doubt in order to establish the offense of conspiracy charged in the indictment.

\* \* \* \* \* \*

Third, that the conspiracy * * * either affected interstate commerce or occurred within the flow of interstate commerce.

3) Finally, the court gave the jury a detailed definition of "interstate commerce":

The Sherman Act is not applicable unless it is first established that there is a restraint or attempted restraint of interstate commerce. Before you can find the defendant guilty, you must find beyond a reasonable doubt that there was such an actual or attempted restraint. You may so find when the allegedly illegal conduct, as charged in the indictment, has a direct impact on goods moving in interstate commerce—which means across state lines—or on goods which are in the flow of commerce—as when the goods are in the state of origin awaiting interstate shipment or in the state of destination on the way to the final consumer.

After giving the above instructions, the court gave the instruction challenged here. The instruction in question was merely part of the court's definition of an "unreasonable" restraint:

To restrain interstate commerce means to interfere *unreasonably* with the ordinary, usual and freely competitive pricing or distribution system of the open market in interstate trde [sic] and commerce.

\* \* \* \* \* \*

The government's burden is satisfied by a showing that the defendant's business activities substantially affected interstate commerce.

Certain types of conduct are regarded as unreasonable per se. This means that the mere doing of the act itself constitutes an unreasonable restraint on interstate commerce, and it is not necessary to consider why the acts were committed, or their effect on the industry, or any other explanatory matter. Conduct regarded as unreasonable per se includes price fixing, division of markets and bid rigging.

(Emphasis added).

We must consider the instructions as a whole, not in isolation, in determining whether a trial court erred. *United States v. Park,* 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975); *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *Aimor Electric Works, Ltd. v. Omaha National Bank,* 727 F.2d 688, 691 (8th Cir. 1984). Here, reading the instructions as a whole demonstrates their propriety. The trial court explained first that the Sherman Act did not apply without a restraint or attempt to restrain *interstate* commerce.

The court then explained that the restraint had to be unreasonable, and that certain types of restraints were unreasonable per se. Under these instructions, the jury had to find that the defendant's business was in interstate commerce before it considered the per se instruction.

Because I do not find error, much less prejudicial error in the instructions, I would affirm.