**Robert PATTERSON, Appellant,**

v.

**Charles J. BLACK, Warden, Nebraska State Penitentiary, Appellee.**

No. 85–1956.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1986.

Decided May 16, 1986.

---

Peter C. Wegman, Lincoln, Neb., for appellant.

Dale D. Brodkey, Lincoln, Neb., for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

This is an appeal from the district court's denial of appellant's petition for writ of habeas corpus, alleging that the prosecutor's failure to produce the results of laboratory tests on the victim's keys prior to trial denied the appellant due process of law. For the reasons stated below, we affirm the decision of the district court.[1]

At 1:00 a.m. on July 3, 1981, a twenty-one-year-old female student at Kearney State College was sexually assaulted while she was jogging home from work. She testified at trial that she was holding her keys at the time and tried to scratch the assailant on his right wrist or arm with them. At this point, as a car approached the area, she screamed. The assailant fled.

At trial the victim described the assailant as 5'8" to 5'9" tall, of medium build, and overweight with a pot belly. She estimated him to weigh approximately 185 to 190 pounds. She also estimated him to be in his late 20's, approximately 27 or 28. She testified that the assailant was wearing a flannel shirt, jeans and heavy shoes. She testified that the shirt was plaid, with blue and probably red, and the sleeves rolled up to the assailant's elbows. The assailant also seemed to be wearing some kind of knit stocking cap. In addition, the victim said she could not see the assailant's face, but could feel a moustache and stubble or a beard.

Detective Dale Hungerford of the Kearney Police Department testified that in his investigation of the area he discovered the victim's keys, and at the same location found several receipts from Londer's Auction House. In all, there were seven receipts and a cash register readout. Hungerford then went to Londer's Auction House with the receipts. There he learned that Patterson had been present at the auction house on the evening of June 2, 1981 and had purchased the items for which he had received the receipts that police had found at the scene of the assault. He paid for the purchases with a check before he left the auction house about 11:00. The owner of the auction house stated that Patterson had returned at around 10:30 in the morning on June 3, 1981 trying to pick up the items he had purchased the night before. Patterson stated he had lost the auction receipts.

Based on the identification provided by the victim and the information they had learned from the auction receipts, on the afternoon of June 3, 1981, Detective Konst and Captain Lynch of the Kearney Police Department went to Holdrege, Nebraska with a search warrant and searched Patterson's premises. Listed on the warrant

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The HONORABLE WARREN K. URBOM, United States District Judge for the District of Nebraska.

were a blue flannel shirt, an orange stocking cap, and auction receipts. With Patterson's approval, they searched his pickup truck where they found a new checkbook and some air freshener which they took into their possession. They then searched his house, finding in one room a long-sleeved flannel shirt, red with dark blue, a pair of blue jeans and a pair of red underwear, all appearing to have been worn.

Detective Konst of the Kearney Police Department testified that Patterson stated that he had been at Londer's Auction House the previous night, arriving about 7:00 and leaving about 12:30. At this point he decided to go to Kearney. While in Kearney, he stopped and bought two cans of pop, drove out to see a friend, and, not finding his friend, returned to Holdrege at about 3:00 a.m. Patterson stated that although the clothes the police had found matching the victim's description were his, that he had not worn them the previous night. He also stated that he had lost his checkbook and auction receipts the previous night, but did not know where he had lost them. Testimony at trial indicated he had notified his bank to stop payment on the lost checks.

At trial Detective Konst described Patterson as 5′8″ to 5′9″, 190 to 200 pounds, heavy set, and as having a moustache and mutton chop sideburns and a two-or three-day growth of beard. Konst also stated that he examined Patterson's right forearm and saw a 1½-inch scratch. Captain Lynch described Patterson as 5′7″ to 5′8″, with a stocky to heavy-set build, and with mutton chop sideburns and three to four days stubble growth on his face. Lynch, however, stated that the only thing unusual he had noticed on Patterson's right forearm was a tatoo.

On June 25, 1981, a lineup was conducted by Hungerford and Lynch at the Kearney Police Department. The victim was unable to identify Patterson, instead picking another man because his height, weight, hair, and facial hair (including beard and moustache) seemed the same as the assailant's. Lynch testified that Patterson, at the time of the lineup, had shaved his sideburns, and was clean shaven except for a moustache.

Prior to trial, Patterson's attorney had requested, and the trial court had ordered, the prosecution "to permit the Petitioner to discover 'all reports or results of scientific tests and experiments made in connection with this case' and '[a]ll information in the possession of the County Attorney which the Defendant could use as evidence favorable to the accused.'" *State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500, 504 (1983). The prosecution failed to disclose prior to trial the results of the test performed on the victim's keys which were allegedly used to scratch the assailant. The laboratory test had indicated that there was no skin or blood on the keys and that therefore the test was essentially negative. In responding to Patterson's motion for a new trial, the county attorney stated in an affidavit that he had not been aware of any laboratory analysis report concerning the keys, but did know through a verbal report made to him by the detective sergeant that nothing had been revealed by the analysis of the keys.

In denying Patterson's habeas corpus petition, the district court held that the disclosure of the test results would not have affected the outcome of Patterson's trial. The court reasoned that there was ample other evidence with which to find beyond a reasonable doubt that Patterson was guilty. Patterson appeals the decision of the district court, asserting that the suppressed evidence was material to his defense, thus denying him due process of law.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. In *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the Supreme Court reaffirmed the *Brady* holding and announced

a three-part test for evaluation the constitutionality of prosecutorial actions in nondisclosure of information cases:

> The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

*Moore,* 408 U.S. at 794–95, 92 S.Ct. at 2567–68.

In this case, the prosecution failed to produce the requested information despite a specific trial court order. Further, the results of the laboratory tests performed on the victim's keys were potentially useful to the defendant and therefore favorable to his defense. Thus, the first two requirements of the *Brady* test were present in this case. Accordingly, the only remaining inquiry before the district court was whether the wrongfully suppressed evidence was "material."

The Supreme Court in *United States v. Bagley,* — U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), reformulated the standard for materiality established in *United States v. Agurs,* 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976), with the following test:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Bagley,* 105 S.Ct. at 3384; *id.* at 3385 (White, J., concurring in part and concurring in judgment). Furthermore, the *Bagley* decision, as interpreted by this Circuit, would make a *Brady* inquiry without regard to the specificity of the request made for evidence by the defense. *United States v. Ben M. Hogan Co., Inc.,* 769 F.2d 1293, 1299 (8th Cir.1985).[2]

We have carefully reviewed the record in this case and conclude that under the *Bagley* standard of materiality and the law of this Circuit there is no reasonable probability that the result of the trial would have been different had the laboratory tests been disclosed to the defense and used by defense counsel at trial.

Most important to the court's analysis is the fact that the State's case did not depend upon the keys alone. *Cf. United States v. Risken,* 788 F.2d 1361, 1375 (8th Cir.1986) (government's case did not depend on informant's testimony alone) (citing *United States v. Bagley,* 105 S.Ct. at 3386–88)). We must agree with the district court that there was sufficient incriminating evidence to establish Patterson's guilt. As the district court stated:

---

**2.** This scrivener and Judge Heaney must, however, question the rule of this Circuit as to the interpretation of *Bagley. See Ben M. Hogan,* 769 F.2d at 1299. On the issue of whether to factor the specificity of the request by defense counsel into the *Brady* calculus, there was no apparent majority on the *Bagley* Court. *See Ben M. Hogan,* 769 F.2d at 1299 n. 9. Despite the *Ben M. Hogan* court's reference in a footnote to the difference of opinion between Justice Blackmun's opinion for the Court and Justice White's concurrence on whether specificity should enter into the *Brady* inquiry, this court stated that the "reasonable probability" inquiry was to be made "irrespective of the specificity of the request * * *." *Id.* at 1299.

We would additionally question the reach of *Bagley* in light of the fact that it was a bench trial (unlike the instant case), and that the same judge who tried the case denied the motion for a new trial. *Bagley,* 105 S.Ct. 3377–78. As a result, any reasonable probability could have been resolved by the district court as finder of fact without the inherent "difficulty [present in a jury trial such as this] of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense had not been misled by the prosecutor's incomplete response." *Id.* at 3384.

In any event, in spite of our disagreement with this Circuit's rule as to the scope of *Bagley,* we are bound by it until the court *en banc* reverses its decision. *See Fast v. School Dist. of Ladue,* 728 F.2d 1030, 1034 (8th Cir.1984); *United States v. Lewellyn,* 723 F.2d 615, 616 (8th Cir.1983); *United States v. Howard,* 706 F.2d 267, 269 (8th Cir.1983).

Whether or not the victim scratched the assailant—and apparently she did not—the negative test results do not refute the fact that the assault occurred; they do not explain away the victim's description of her assailant that matches the petitioner as to height and weight and other physical characteristics, or that a shirt found in the petitioner's possession matched the victim's description of the assailant's shirt. Perhaps the strongest evidence linking the petitioner to the crime is the cash register slip and auction house receipts which belonged to the petitioner and were found at the crime scene. The absence of blood or skin on the key does not explain how these items came to be found at the scene.

*Patterson v. Black,* No. CV84-L-298, slip op. at 3 (D.Neb. July 11, 1985). Under these circumstances, we cannot say that the government's failure to disclose the laboratory test on the keys is sufficient to undermine our confidence in the jury's verdict. Accordingly, the judgment of the district court is affirmed.

BOWMAN, Circuit Judge, concurring.

For the reasons set forth in the opinion of the Court, I agree that the judgment of the district court should be affirmed. I write separately to address footnote 2 of the opinion of the Court, *ante* at 110, and to indicate my continuing belief that the view of *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), set forth in *United States v. Ben M. Hogan Co., Inc.,* 769 F.2d 1293 (8th Cir.1985), is correct.

As the opinion of the Court observes, the Supreme Court in *Bagley* adopted a "reasonable probability" standard of materiality for evidence requested by a defendant. *See ante* at 110. We concluded in *Hogan* that this standard of materiality applies irrespective of the specificity of the request. 769 F.2d at 1299. This conclusion follows from the explicit statement in the concurring opinion in *Bagley,* 105 S.Ct. at 3385 (White, J., joined by Burger, C.J., and Rehnquist, J.), and from the language in Justice Blackmun's opinion, which was joined by Justice O'Connor. *Id.* at 3384. In discussing the relevance of the defense's request for disclosure, Justice Blackmun stated that

under the [reasonable probability] formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case ... in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Id.* This passage, to my mind, reflects a concern not with the specificity of the request, but rather with the effect that the nondisclosure had on the fairness of the trial. The concurrence written by Justice White specifically agrees with Justice Blackmun's adoption of the reasonable probability standard of materiality, and further observes, again in agreement with Justice Blackmun, that the reasonable probability test is sufficient to deal with all cases of prosecutorial failure to disclose evidence favorable to the accused. *Id.* at 3385. Thus I believe that *Hogan* is consistent with the position adopted by a majority of the Supreme Court in *Bagley.*

Similarly, I am unable to find any indication in the *Bagley* opinions that the Court would distinguish between bench and jury trials for purposes of the materiality standard. In any event, I am convinced that the nondisclosure of the evidence at issue in this case does nothing to undermine confidence in the result reached by the jury. Accordingly, I join the Court's opinion subject to the above reservations concerning footnote 2.