**UNITED STATES of America, Appellee,**

v.

**Maurice G. BARNES, Appellant.**

**No. 85–2315.**

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1986.

Decided Aug. 5, 1986.

Joseph A. Colussi, Madison, Ind., for appellant.

Thomas M. Larson, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

ROSS, Circuit Judge.

Maurice G. Barnes was convicted of distributing cocaine and conspiring to distribute cocaine. On appeal, Barnes argues that: 1) a government agent's misconduct violated his due process rights and should have resulted in a dismissal of the charges

against him, 2) he was entrapped as a matter of law, and 3) his sixth amendment right of confrontation was violated when he was denied the opportunity to impeach a government agent's credibility during cross-examination.

We conclude that Barnes' right of confrontation was violated and that the violation does not constitute harmless error. Accordingly, we vacate Barnes' conviction. Because we reject his other contentions, Barnes may be retried if the government continues to seek his conviction.

## FACTS

Barnes sold one-eighth ounce of cocaine to Jim Case, a paid undercover government informant, on June 13, 1985. He also attempted to sell one ounce of cocaine to Case on June 25, 1985. Two separate indictments charged him with distributing cocaine in violation of 21 U.S.C. § 841(a)(1) and with conspiring to distribute cocaine in violation of 21 U.S.C. § 846.

Barnes' defense was entrapment. He contends that he is a "pliable, middle-aged alcoholic who knew nothing about cocaine distribution." He sold the cocaine to Case, he asserts, as an act of friendship towards Case only after Case spent over three months developing a close relationship with him and overcoming his reluctance to engage in the drug trade.

Barnes' relationship with Case actually began in December of 1981 at a time when they were both employed in a temporary labor pool.[1] While working together, Case offered Barnes a marijuana cigarette. Barnes accepted. Barnes admits that he later purchased marijuana from Case on several occasions during 1982 and 1983. Case testified that Barnes also purchased amphetamines and cocaine, and that sometimes they reversed roles, and Barnes sold such drugs to Case.[2] Barnes disputes these facts.

---

1. Case testified that he had first met Barnes in 1979 or 1980 while working in the labor pool. Employment records submitted by Barnes established that the date must have been in December of 1981, as Barnes had testified.

2. On cross-examination, Case stated that he had also seen Barnes use cocaine and amphetamines. Barnes submitted medical evidence showing that he was an epileptic, that he would have suffered disabling seizures and other medical effects if he had ingested such drugs, and

Barnes plays down his illegal drug purchases, claiming that he used the marijuana primarily to lessen his dependence on alcohol. He further testified that he purchased his last supply of marijuana from Case in July of 1983 and thereafter, at the urging of his wife, discontinued using marijuana. He had no contact with Case during the remainder of 1983 or during 1984.

In July of 1984, Case began working as a paid informant for the government. He operated under the direct supervision of Carl Hicks, an agent with the Drug Enforcement Administration (DEA). Case's job was to select targets for undercover investigations and then arrange for the targets to sell him illegal drugs. In furtherance of this position, Case decided to contact Barnes.

Case testified that he called Barnes at work and left a message. A week later, Barnes returned Case's call. When Case told Barnes that he needed to purchase some cocaine, Barnes said he could help. Case and Barnes then made arrangements over the telephone for the two cocaine sales involved in this case. The first sale, according to Case, occurred approximately ten days after Case's first call to Barnes.

Barnes' version of the events is radically different. According to Barnes, Case began telephoning him at his office in March of 1985 and at his home during the following month. Initially, Barnes had refused to return Case's calls. In May, Case informed Barnes that his drug supplier had been arrested and that he needed a source of cocaine. Barnes said he could not help. Case, however, continued calling. After some time, the frequency, source, and location of the calls began to cause problems for Barnes. His employer questioned him about the calls because he thought Barnes was doing contracting work "on the side" for Case. His wife also questioned him,

because she feared that Barnes was again purchasing marijuana from Case. In early June, Barnes felt he could avoid Case no longer, and finally agreed to locate a source of cocaine for him. He contacted Phil White, a coworker, because he had overheard White talk about drugs. Arrangements for the two sales were then made over the telephone. The first sale, according to Barnes, occurred approximately three and one-half months after Case's first call.

Barnes was arrested before the second sale was completed.[3] Thereafter, the indictments against Barnes were entered.

Prior to trial, Barnes filed a motion to dismiss the indictments. The motion contained the following allegations:

[A] government agent, Carl Hicks of the Drug Enforcement Administration, has made false statements under oath and has made intentional misrepresentations to government and appointed counsel about the existence of exculpatory tape recorded conversations concerning Mr. Barnes. Agent Hicks has also violated court orders, ignored written requests of counsel, and destroyed or lost other recorded conversations. His misconduct has violated the constitutional due process rights of Mr. Barnes and the supervisory powers of the federal courts, and has corrupted the criminal justice system.

The "tape recorded conversations" alluded to in the motion concern telephone calls between Case and Barnes. Case had recorded the calls in furtherance of the DEA's investigation into Barnes.

Initially, the government provided Barnes with a tape of six such conversations. Each of these six conversations had taken place on June 25, 1985—the day of the second cocaine sale. On three separate

that his medical records revealed no evidence of such medical effects.

3. The arrest is a story in itself. Case had arranged for the second sale to take place at a McDonald's parking lot at a little before 5:00 p.m. When DEA agents attempted to make the arrest, Barnes' supplier, Phil White, fled in a

car. The agents fired numerous shots at the car and disabled it at the entrance to the parking lot. Several young children had been in the parking lot at the time of the arrest and retrieved a packet of cocaine which White had thrown from the car.

occasions (a July 2, 1985 preliminary hearing, a July 30, 1985 omnibus hearing, and an August 2, 1985 interview) Hicks told the prosecutor, Robert Larsen, and Barnes' counsel, Joseph Colussi, that no other recorded conversations existed. He also told them that he was not aware of any conversations between Case and Barnes other than those on June 25, 1985.

On September 4, 1985 Hicks revealed a second set of nine taped conversations which had taken place between June 10, 1985 and June 24, 1985 (but not on June 13, 1985—the day of the first cocaine sale). In several of these tapes Hicks' voice was audible in the background.

After Barnes filed his motion to dismiss, Hicks submitted an affidavit admitting that he had previously known about the second set of taped conversations. He claimed that he did not turn them over earlier because he had thought that he had only been asked to turn over tapes of conversations occurring on the days of the two cocaine sales. He also declared that he had not thought that the tapes were needed by Barnes.

After holding an evidentiary hearing on the motion to dismiss, the trial court ruled that, "assuming all evidence has now been made available to defense counsel, the severe sanction of dismissal of [the] indictment is not warranted." Sept. 13, 1985 Order at 3. The court observed that "Hicks" failure to disclose the existence of the * * * [second set of] tapes is suspect, especially in light of the presumed knowledge and experience gathered in thirteen (13) years of work as an FBI Agent." *Id.* at 2. Nevertheless, the court found that "Hicks may have misunderstood the nature of the Government's requests * * * [and] there is no evidence that Hicks intentionally destroyed, altered or concealed these tape recordings." *Id.* at 1.

Three days later, the case proceeded to trial. Hicks testified on direct examination about his role in the undercover investigation of Barnes, including his duties with respect to identifying the tapes, and about the second cocaine sale at issue in this case.

On cross-examination, Barnes asked him about his pretrial statements denying that he had monitored telephone calls on other days. Barnes then attempted to ask Hicks about his pretrial statements denying that any telephone conversations were taped other than those occurring on June 25, 1985. The government, however, objected on the basis that this matter had been settled by the trial court's ruling on Barnes' motion to dismiss. The court accepted the government's reasoning and sustained the objection despite Barnes' complaint that the questioning was germane to the issue of Hicks' credibility. Barnes made an offer of proof on the matter and the case continued.

After the case came to a close, Barnes filed a motion for a judgment of acquittal. The motion alleged that the evidence established he had been entrapped as a matter of law and that his due process rights had been violated by the government's suppression and destruction of exculpatory evidence, and by its use of perjured testimony. The motion was denied and the jury found Barnes guilty. Barnes was sentenced to two years imprisonment, a three-year special parole term, and probation following his release from custody. He has been at liberty pending the resolution of this appeal. We now deal with the three issues raised by Barnes.

## DISCUSSION

### 1. Government Misconduct

■ Both the prosecution and the defense asked Hicks to turn over all tapes of conversations between Case and Barnes. These tapes were useful to Barnes' entrapment defense primarily as evidence of the delay between Case's initial contact with Barnes and the first cocaine sale. Barnes also attempted to use the actual content of the tapes to show his inexpertise and lack of knowledge about cocaine sales. It thus appears that Barnes has taken steps to meet the *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) requirements: a request by the defense for evidence which is favorable to the defense

and which is material.[4] *See Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972); *Patterson v. Black*, 791 F.2d 107, 109–10 (8th Cir. 1986). The missing element, however, is actual suppression of that evidence. Hicks turned over the second set of tapes, albeit late, and the evidence does not at this point establish that Hicks has destroyed or is still withholding other tapes.

Barnes asks us to infer that other tapes are still undisclosed. He relies on evidence presented at trial relating to telephone calls made by Case to Barnes' office in March and April of 1985.

The weakness in Barnes' argument is that the evidence supports a conclusion that not every call between Case and Barnes was tape recorded. In other words, Case could have called Barnes in March and April and not recorded the calls.

In denying Barnes' motion for a judgment of acquittal at the close of all the evidence, the trial court had an opportunity to reconsider Barnes' contention that Hicks had destroyed or was still withholding other tapes. By denying the motion, the trial court implicitly rejected this contention. There is sufficient evidence in the record to support the trial court's conclusion, so we accept it for the purpose of this appeal.

■ We also accept the trial court's conclusion that Hicks' delay in giving Barnes the tapes and Hicks' pretrial misrepresentations regarding the tapes do not warrant a dismissal of the charges against Barnes. By accepting this conclusion, however, we do not mean to condone Hicks' conduct. We do not. We merely hold that his conduct does not warrant the severe sanction of dismissal based on the evidence adduced to date.

## 2. Entrapment as a Matter of Law

Barnes contends that he was entrapped as a matter of law. In furtherance of this contention, he compares his case to *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

In *Sherman*, the Supreme Court held that the petitioner had established his defense of entrapment as a matter of law. The undisputed facts were set forth as follows:

Kalchinian, a government informer, first met petitioner at a doctor's office where apparently both were being treated to be cured of narcotics addiction. Several accidental meetings followed, either at the doctor's office or at the pharmacy where both filled their prescriptions from the doctor. From mere greetings, conversation progressed to a discussion of mutual experiences and problems, including their attempts to overcome addiction to narcotics. Finally Kalchinian asked petitioner if he knew of a good source of narcotics. He asked petitioner to supply him with a source because he was not responding to treatment. From the first, petitioner tried to avoid the issue. Not until after a number of repetitions of the request, predicated on Kalchinian's presumed suffering, did petitioner finally acquiesce. Several times thereafter he obtained a quantity of narcotics which he shared with Kalchinian. Each time petitioner told Kalchinian that the total cost of narcotics he obtained was twenty-five dollars and that Kalchinian owed him fifteen dollars. The informer thus bore the cost of his share of the narcotics plus the taxi and other expenses necessary to obtain the drug. After several such sales Kalchinian informed agents of the Bureau of Narcotics that he had another seller for them. On three occasions during November 1951, government agents

---

**4.** We do not mean to intimate that the materiality requirement would have been established if the tapes had been suppressed. Absent a suppression, we cannot make such a determination because the materiality element is defined as "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Patterson v. Black*, 791 F.2d 107, 110 (8th Cir.1986) (*quoting United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985)). More importantly, absent a suppression, there is no need to determine whether the other *Brady* elements are satisfied.

**288**

observed petitioner give narcotics to Kalchinian in return for money supplied by the Government.

*Id.* at 371, 78 S.Ct. at 820. In support of its contention that the petitioner had not been entrapped, the government pointed to the petitioner's previous convictions for selling narcotics. The Supreme Court was unconvinced by this evidence, largely because the petitioner had been trying to overcome his narcotics habit at the time he was approached by Kalchinian.

If we accept Barnes' version of the facts, the comparison to *Sherman* is appealing. As in *Sherman,* Barnes was attempting to overcome an addiction (albeit to alcohol rather than to narcotics) at the time he was approached by Case. And like the petitioner in *Sherman,* Barnes initially tried to avoid Case's attempts to lure him into selling drugs. Furthermore, as in *Sherman,* Barnes was pressured into selling drugs by Case's persistent requests. As proof that such pressure was needed, Barnes points to a taped conversation between himself and Case on the day of the second cocaine sale. In the background, we can hear Hicks whispering to Case: "Egg him on".[5] Barnes insists that, were he really predisposed to distribute cocaine, Case would not have needed to "egg him on".

The problem with Barnes' entrapment argument is that there is evidence in the record which creates a jury question on the critical issue of whether Barnes was predisposed to distribute cocaine. *See generally, United States v. Dion,* 762 F.2d 674, 687–88 (8th Cir.1985) (list of ten factors used to determine predisposition). First, the government's version of the facts, via Case's testimony, was that Barnes readily responded to Case's request for a source of cocaine. Moreover, in responding to this request, Barnes was fully aware that Case wanted a source for redistribution, not merely personal use. Second, Barnes had admittedly purchased marijuana from Case in the past and according to Case's testimony, had also previously purchased, and sold, other illegal drugs. Third, comments made by Barnes could lead a factfinder to conclude that Barnes was an experienced and willing drug dealer. For example, in making arrangements for the second cocaine sale, Case asked Barnes: "Can we do another one?" Barnes replied: "Yeah. I don't see why not." When some problems with the arrangements arose, Barnes was taped as saying: "I've never experienced this in anything I, you know, *the guys I deal with.* I never—they *never pulled this.*" (emphasis added). Further, the negotiations between Case and Barnes relating to the location of the second cocaine sale were tough and complicated; the negotiations were not the sort which an unwilling, neophyte drug dealer would engage in. In fact, Hicks' "egg him on" comment, relied upon by Barnes, actually occurred during these negotiations. In the context in which the comment was made, the need to "egg Barnes on" may actually be read as proof that Barnes was a cautious, "wary criminal" who merely needed to be coaxed into the government's trap. *See United States v. Underhill,* 753 F.2d 645, 647 (8th Cir.1985).

In determining whether an entrapment as a matter of law defense is established "we must view the evidence in the light most favorable to the government. * * * Where there is conflicting evidence, '[t]he question of entrapment is ordinarily for the jury.'" *United States v. Leroux,* 738 F.2d 943, 947 (8th Cir.1984) (*quoting Holmes v. United States,* 709 F.2d 19, 20 (8th Cir.1983)). Because there is conflicting evidence in this case, the trial court properly rejected Barnes' entrapment as a matter of law defense.

### 3. Right of Confrontation

During the cross-examination, Barnes sought to impeach Hicks' credibility by confronting him with his pretrial statements relating to the tapes. The trial court re-

---

**5.** When Hicks transcribed the tape he did not include the "egg him on" comment in the transcript. We listened to the tape and had no difficulty hearing the comment. Hicks' failure to include the comment in the transcript is distressing to say the least.

fused to permit this line of questioning because it had previously determined that Hicks' pretrial statements did not warrant a dismissal of the indictments. Barnes claims that this refusal violated his sixth amendment right of confrontation and warrants a new trial.

Two recent opinions from the Supreme Court have a bearing on this claim. The first, *Crane v. Kentucky,* — U.S. —, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), is important to this case because the Court rejected reasoning similar to that used by the trial court in this case. The facts in *Crane* involved a confession given by the defendant after his arrest. Following a pretrial hearing, the trial court determined that the confession was voluntarily given. At trial, the defendant sought to introduce testimonial evidence relating to the circumstances surrounding the confession. His objective was to show that the confession was unworthy of belief. The trial court, however, ruled that the testimony was inadmissible because it related to an issue that had previously been settled—the voluntariness of the confession. This reasoning was unanimously rejected by the Supreme Court. The flaw in the reasoning, the Court concluded, was its premise that "evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories." *Id.* at 2145. This premise was mistaken because " 'evidence surrounding the making of a confession bears on its credibility' as well as its voluntariness." *Id.* (*quoting Jackson v. Denno,* 378 U.S. 368, 386 n. 13, 84 S.Ct. 1774, 1786 n. 13, 12 L.Ed.2d 908 (1964)).

■ The trial court's reasoning in this case is flawed in the same manner as the reasoning rejected in *Crane.* Evidence relating to Hicks' pretrial statements was important to the trial court's resolution of Barnes' motion to dismiss. But the same evidence would have also been important to the jury's determination of whether Hicks was a credible witness. The trial court's resolution of the motion to dismiss in favor

of the government did not and could not take this latter question from the jury. We thus reject the reasoning used by the trial court and proceed to the issue of whether the trial court's limitation on Barnes' cross-examination requires a reversal of his conviction.

On this issue, we are guided by a second recent Supreme Court opinion—*Delaware v. Van Arsdall,* — U.S. —, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). In *Van Arsdall* the Supreme Court held that the trial court violated a defendant's confrontation rights by limiting his opportunity to cross-examine a government witness. The Court reasoned:

> In this case * * * the trial court prohibited *all* inquiry into the possibility that Fleetwood [(a government witness)] would be biased as a result of the State's dismissal of his pending public drunkenness charge. By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause.

*Id.* at 1435 (footnote omitted, emphasis in original). The Court then concluded, however, that the trial court's error would not require a reversal of the defendant's conviction if "a reviewing court * * * [determines] that the error was harmless beyond a reasonable doubt." *Id.* at 1438. The Court left this determination to the state courts, but provided the following guidance:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of

course, the overall strength of the prosecution's case.

*Id.*

In this case, the questioning which Barnes was prohibited from engaging in may have served to impeach Hicks' credibility. The actual effect of the questioning would have depended on whether the jury believed Hicks' claim that he thought he had only been asked to turn over tapes of conversations occurring on the days of the two cocaine sales. If the jury did not believe Hicks' claim, it would have recognized that Hicks lied about Barnes' case in the past. Beyond impeaching Hicks' credibility, however, the questioning would also have served to raise doubts in the jurors' minds as to whether Hicks is still withholding more tapes. This, in turn, would have bolstered Barnes' attempt to prove that Case contacted him several months before he agreed to engage in the cocaine sales involved in this case.

■ We, of course, recognize that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 1435. We also fully understand that "'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id. (quoting Delaware v. Fensterer,* — U.S. ——, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985)) (emphasis in original). Nevertheless, we conclude that the trial court's limitation on Barnes' cross-examination of Hicks violated his confrontation rights. The trial court's limitation was supported only by flawed reasoning, not justifiable trial concerns, and the limitation denied Barnes an opportunity for effective cross-examination.

■ We also conclude that the limitation was not harmless beyond a reasonable doubt. As previously discussed, the foreclosed questioning might have impeached Hicks *and* bolstered Barnes' entrapment defense. It cannot reasonably be denied that Hicks, the government agent in charge of supervising the government's undercover informant, was an important witness and that impeaching his credibility would have weakened the government's case. Moreover, with respect to the entrapment issue, the government's case was not an overly strong one in relation to Barnes' case. We find it possible that the jury's verdict would have been different if Barnes had not been prohibited from asking Hicks about his pretrial statements relating to the tapes. Accordingly, we vacate his conviction.[6]

If the government continues to seek Barnes' conviction and a new trial is held, Barnes should be permitted to cross-examine Hicks with respect to Hicks' pretrial statements without undue restraint. In addition, if Barnes desires, he should be permitted to produce Robert Larsen, the prosecutor in charge of Barnes' case until shortly before trial,[7] as a witness to explain precisely what tapes Larsen had asked Hicks to give to the defense, and why he withdrew from the case.

In accordance with the above, the judgment is vacated.

---

6. Our resolution of this issue makes it unnecessary for us to address Barnes' contention that the trial court erred in refusing to permit him to use a calendar as an exhibit during closing arguments. Barnes had sought to use the exhibit to show the dates on which the telephone calls between Case and Barnes occurred.

7. Barnes claims that Larsen withdrew from the case and implies that the reason for this withdrawal was that Larsen was disgusted with Hicks' conduct relating to the tapes. The government, however, says that Larsen did not withdraw. According to the government, Barnes' case was simply reassigned to another prosecutor to avoid trial docket conflicts.