**UNITED STATES of America, Appellee,**

v.

**William Anthony POU, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Joseph Michael POU, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Miguel MONDEJAR, Appellant.**

**Nos. 91–1765, 91–1766 and 91–1770.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1991.

Decided Jan. 6, 1992.

Clarence E. Mock, III, Oakland, Neb., for W. Pou.

Michael F. Gutowski, Omaha, Neb., for J. Pou.

Phillip G. Wright, Omaha, Neb., for Mondejar.

Bruce W. Gillian, Lincoln, Neb., for U.S.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

William Pou, Joseph Pou, and Miguel Mondejar each was charged with conspiracy to distribute or possess with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1988) (Count I); use of a communication facility (the telephone) in furtherance of the conspiracy, a violation of 21 U.S.C. § 843(b) (1988) (Count III); and knowing distribution or possession with intent to distribute cocaine within 1000 feet of a public school in violation of 21 U.S.C. § 845a(a)[1] (Count VII).[2] The defendants were tried jointly to a jury in District Court.[3] All were found guilty of Count I; all were acquitted on Count VII. Only William Pou was found guilty of Count III.

William Pou was sentenced to 360 months in prison to be followed by five years of supervised release. He was ordered to pay a special assessment of $100 and his share (one-third) of the taxable costs of trial. The District Court sentenced Joseph Pou to a prison term of 260 months, with five years supervised release, and ordered him to pay a special assessment of $50 and one-third of the taxable costs of trial. Mondejar was sentenced to a 290–month term of imprisonment, with five years supervised release. He, too, was ordered to pay a special assessment of $50 and his share of the taxable costs. All three defendants appeal their convictions and their sentences. We affirm the District Court in all respects.

On appeal, Mondejar and both Pous allege *Brady* violations on the part of the government because of the alleged failure of the prosecution to turn over to counsel for the defense unidentified exculpatory and/or impeachment materials in its pos-session. Appellants assert that the court erred in declining to conduct an *in camera* review of the prosecutor's entire file in this case. Joseph Pou and Mondejar challenge the District Court's failure to try them separately, in spite of their motions for severance. Mondejar alleges that more than one conspiracy was proved, but only one was charged. Thus, the variance between the indictment and the proof at trial, according to Mondejar, requires a reversal of his conviction. As to their sentences, all appellants contend that the District Court erred in basing their Guidelines sentences upon the court's conclusion that at least five to fifteen kilograms of cocaine were handled by the coconspirators. Joseph Pou challenges the enhancement of his Guidelines sentence for possession of a firearm during the commission of the conspiracy. Both Pous, claiming indigency, challenge the District Court's assessment of costs. We will consider each of these grounds for appeal separately.

I.

All the appellants claim that the District Court's handling of their *Brady* challenges was ineffective to ensure that the prosecutor released to them all exculpatory or impeachment materials in the government's files. We find no merit to their claims.

About two weeks before the court began receiving evidence at trial, the United States Attorney's office sent to appellants' counsel the plea and immunity agreements it had made with government witnesses and redacted copies of Federal Bureau of Investigation (F.B.I.) 302 reports, written summaries of some of the interviews that the F.B.I. conducted with witnesses in this case. At the appellants' request, the District Court examined the unredacted 302s

---

1. 21 U.S.C. § 845a(a) was redesignated as 21 U.S.C. § 860(a) and amended in 1990. Crime Control Act of 1990, Pub.L. No. 101–647, §§ 1002(b), 1214(1), 1990 U.S.C.C.A.N. (104 Stat.) 4789, 4827, 4833.

2. The Second Superseding Indictment named sixteen defendants and contained seven counts. The Pou brothers and Mondejar were the only

defendants to go to trial on this indictment. Before the trial began, the government dismissed four of the seven counts against the remaining defendants. Transcript at 2888.

3. The Honorable Lyle E. Strom, Chief Judge, United States District Court for the District of Nebraska.

*in camera,* and also reviewed 302s that had not been produced to the defense. The court ordered the release of some of the withheld summaries and some of the redacted information. The court declined appellants' request to order production of all the government's files in this case for an *in camera* review.

Shortly after the trial got underway, the F.B.I. case agent for the first time revealed to the prosecutor and to counsel for the defense that one of the government's witnesses, Kevin Dobson, was a paid informant for the F.B.I. The information was in the hands of the defense one week before Dobson was called to testify as a witness for the prosecution and the defense cross-examined him on his role as a government informant.

Also, the District Court received in evidence a photograph, about which the government asserted it was unaware—and thus the defense was unaware—until the trial had commenced.

These incidents form the basis for appellants' claims that the prosecution withheld material in the government's files to which the defense was entitled. A review of the applicable law convinces us that the District Court did not err in refusing to review all of the government's files *in camera.*

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court declared the rule "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. Over the years the Court has elaborated upon the rule. The obligation of disclosure now encompasses not only exculpatory evidence, but also evidence that might be valuable in impeaching government witnesses. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985) (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)). Further, the duty to produce such material arises even if the defense request is non-specific or if there is

no request at all. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).

According to appellants, because the incidents cited above were clearly violative of their due process rights as set forth in *Brady,* it therefore follows that the government withheld other information that would have resulted in an acquittal at trial. The District Court, relying on the representations of the prosecution that it had produced all *Brady* materials in its files, refused to conduct an *in camera* review of all the government files. Mondejar further argues that the incidents detailed above, in and of themselves, warrant reversal of his conviction and remand for a new trial. In the alternative, he, together with the other appellants, requests this Court to remand the case to the District Court for an *in camera* review of all the government's files.

"In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland,* it is the [prosecuting entity] that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." *Pennsylvania v. Ritchie,* 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987) (citation omitted) (footnote omitted). There is no constitutional requirement for the prosecutor "to deliver his entire file to defense counsel." *Agurs,* 427 U.S. at 111, 96 S.Ct. at 2401; *accord Bagley,* 473 U.S. at 675, 105 S.Ct. at 3379; *see also United States v. McMahan,* 744 F.2d 647, 651 (8th Cir.1984) (*Brady* "does not require the government to provide defendants with all information it has regarding each of its witnesses").

The *Brady* rule applies in situations where, after trial, it is discovered that the prosecution had material information of which the defense was unaware. *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. We agree with the Court of Appeals for the Seventh Circuit: "Mere speculation that a govern-

ment file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court." *United States v. Navarro,* 737 F.2d 625, 631 (7th Cir.), *cert. denied,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984).

Mondejar and William Pou cite an opinion from the Court of Appeals for the Second Circuit as authority for their position that remand for an *in camera* review is appropriate here. *See United States v. Kiszewski,* 877 F.2d 210 (2d Cir.1989). Their reliance is misplaced. In *Kiszewski,* the court did remand for an *in camera* review, but not of the prosecutor's entire file. Instead, the alleged *Brady* material was quite specific: the personnel file of an F.B.I. agent who was a government witness at trial. Very specific documents in that file, with possible impeachment value, had been identified, but the court nevertheless declined an *in camera* review. The review on remand was limited to this witness's file. *See id.* at 215–16.

We decline to expand the *Brady* rule and the obligation of the district courts by remanding this case solely because of appellants' less than logical conclusion that, because some *Brady* material was disclosed late, some other *Brady* material was withheld altogether. *Cf. United States v. Stuart,* 923 F.2d 607, 613 (8th Cir.) (speculation as to existence of materials "in other files in other jurisdictions does not require ... the trial court to conduct an *in camera* review of government files for evidence favorable to the accused"), *cert. denied,* —— U.S. ——, 112 S.Ct. 145, 116 L.Ed.2d 111 *and* —— U.S. ——, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991); *United States v. Barnes,* 798 F.2d 283, 287 (8th Cir.1986) (Court declined to "infer" that exculpatory audio tapes were undisclosed because another set of tapes had been disclosed late). The appellants' showing that the government in fact withheld *Brady* ma-

terial is inadequate to remand the case and require the District Court to conduct an *in camera* fishing expedition through the government's files in this case. We hold that the court below did not err in refusing to do so.

We further hold that there exists no "reasonable probability" that Mondejar's due process rights were violated by the late disclosure of various materials. *United States v. Janis,* 831 F.2d 773, 776 (8th Cir.1987), *cert. denied,* 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988). The information in question was in the hands of Mondejar's defense counsel with adequate time for him to prepare. There was no prejudice to Mondejar, and the District Court did not err in so holding.

## II.

◾ Joseph Pou and Mondejar contend that the District Court erred by refusing to order separate trials for the appellants. Joseph Pou's argument is that he was prejudiced because William Pou testified at trial, and because he expected Mondejar to testify. Joseph Pou did not testify and so, he reasons, his constitutional right not to testify against himself became a sword instead of a shield because his failure to testify when his codefendant William did testify made it appear as though Joseph had something to hide. According to Joseph Pou, counsel for William further drew attention to Joseph's failure to testify during voir dire, opening argument, and his direct examination of William.

Joseph Pou is entitled to a reversal on this theory only if he can affirmatively demonstrate that the District Court abused its discretion in refusing to sever, and that the joint trial clearly prejudiced Pou's right to a fair trial. *See United States v. Brown,* 921 F.2d 785, 793 (8th Cir.1990); *see also* Fed.R.Crim.P. 14. We are not persuaded that Pou has met this "difficult burden" of proof. *Brown,* 921 F.2d at 793.

The source of prejudice, according to Joseph Pou, is William Pou's testimony and the comments of William's counsel upon it.[4]

4. Although Joseph Pou also argues that he was prejudiced because Mondejar's attorney said in

According to Joseph, William's counsel mentioned the Fifth Amendment prohibition against compelled self-incrimination three times: during voir dire, during opening argument, and at the beginning of William Pou's direct examination.[5] Counsel for Joseph Pou never objected to these references. Joseph Pou's failure to testify was never remarked upon by anyone in the presence of the jury nor was any attention drawn to the fact that he did not take the stand while William did. We can discern not even minimal prejudice from the comments of counsel.

We also note that the court instructed the jury as follows: "There is no burden upon a defendant to prove that he is innocent. Accordingly, the fact that a defendant did not testify must not be considered by you in any way, or even discussed, in arriving at your verdicts." Instruction No. 20, *reprinted in* Appellants' Joint Appendix at 163–64. This instruction further reduced any likelihood that Joseph Pou's right to a fair trial was prejudiced by the remarks of William Pou or his counsel.

Joseph Pou also claims prejudice from the actual testimony of William Pou, but has offered no explanation as to how that testimony "weakened Joseph's defense," beyond stating flatly that it did. Brief of Joseph Pou at 11. Nevertheless we have undertaken a review of William's testimony at our own instance and find nothing in it that was clearly prejudicial to Joseph Pou.

Mondejar's claim of prejudice resulting from the court's failure to sever is slightly different. He argues a "spillover effect" from the evidence against William Pou and Pou's own testimony. According to Mondejar, the evidence against Pou was far more damaging than that presented against Mondejar, and was so inflammatory that the jurors were unable to separate in their minds the activities of William Pou and Mondejar. We disagree.

Ordinarily, indicted coconspirators should be tried together, especially where the proof of conspiracy overlaps. *United States v. Stephenson*, 924 F.2d 753, 761 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 *and* —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991); *see also* Fed.R.Crim.P. 8(b). "Rarely, if ever, will it be improper for co-conspirators to be tried together...." *United States v. Drew*, 894 F.2d 965, 968 (8th Cir.), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). "This preference for joint trials is not limited by any requirement that the quantum of evidence of each

---

opening remarks that Mondejar would testify at the trial, Transcript at 3009, Mondejar never was called to the stand. Therefore the remarks of Mondejar's counsel could not possibly have been prejudicial to Joseph Pou.

5. During voir dire counsel for William Pou, addressing the potential jurors, said, "Are you familiar with that portion of our Constitution that is called the 5th Amendment? Is there anybody who is not familiar with that? If you are not, would you please raise your hand? Mr. Held?" A juror responded, "Yes," and counsel asked, "You don't know what I mean when I—." The juror said, "When you say 5th Amendment, I do not know." Counsel continued: "It's the provision of the Constitution that generally talks about that you have a right not to incriminate yourself or testify, you can remain silent. Now that I have said that, is there anybody who is not familiar with that part of the Constitution. The judge has instructed you about when a defendant does not testify, that you cannot use the fact that they don't testify, that you cannot use the fact that they don't testify against them in any way. But I would like to ask the question the other way. If William Pou would testify would there be anyone here that would think

to themselves, well, you know, maybe I can't give his testimony as much credence as I would any other witness who would be here because he has been accused by the government? Is there anybody who feels like his testimony would be less credible because he has been accused? Is there anybody here who feels like he might want not to tell the truth to save his own skin? So I take it then, under the judge's instructions, that you will evaluate William Pou [sic] testimony in the same way that you will evaluate all the other witnesses?" Transcript at 2965–66. During his opening statement counsel said of William, "He is not going to hide behind the 5th Amendment. He is going to take the witness stand and testify under oath and tell you everything he knows about these people." Transcript at 2988–89. The following exchange was had between William and his counsel at the beginning of William's testimony: "Q. Now, have I talked with you about that you have constitutional right to remain silent? A. Yes, you have. Q. You have decided you wanted to take the stand and speak, is that correct? A. Yes, indeed." Transcript at 2025.

defendant's culpability be quantitatively or qualitatively equivalent." *Stephenson*, 924 F.2d at 761. We have reviewed the record and conclude that, although the evidence against William Pou was indeed more extensive than the evidence against Mondejar, a jury would have no difficulty separating the evidence against Pou from the evidence against Mondejar. In fact, William Pou in his testimony made every effort to distance himself from Mondejar and to minimize any relationship between the two. Severance of the appellants' trials one from another was not required "simply because the evidence may have been more damaging against one appellant than the others." *United States v. Garcia*, 785 F.2d 214, 220 (8th Cir.), *cert. denied*, 475 U.S. 1143, 106 S.Ct. 1797, 90 L.Ed.2d 342 (1986). Further, the court's instructions to the jury minimized any possible prejudice: "Keep in mind that you must consider each defendant separately and give separate consideration to the evidence as to each individual defendant. You must return a separate verdict for each defendant, and you must consider separately each crime charged against each individual defendant...." Instruction No. 13, *reprinted in* Appellants' Joint Appendix at 152.

Mondejar did not make a motion for severance until William Pou testified, and claims that Pou had made, in effect, a surprise confession of his own involvement in the conspiracy during his testimony. Judging from the vehemence with which William Pou reiterates his innocence on this appeal, we think he would be quite surprised to learn that he had "confessed" at trial. We have reviewed William Pou's testimony and nowhere did he confess, "effectively" or otherwise, but instead consistently denied his involvement in any drug conspiracy.

Both Joseph Pou and Mondejar have made references in their briefs to the inconsistent and irreconcilable defenses of the appellants. This, of course, could be a source of the clear prejudice required for a reversal as a result of the District Court's failure to sever. *See United States v. Gutberlet*, 939 F.2d 643, 645 (8th Cir.1991). The appellants do not explain to this Court,

however, how the defenses were irreconcilable, and we perceive no incompatibility from our own review of the record.

### III.

Mondejar contends, as a part of his argument that the failure to sever the appellants' trials was error, that he was charged with one conspiracy, but at least one other conspiracy in which he was not involved was proved. This "variance," Mondejar contends, caused him to suffer substantial prejudice and provides grounds for reversal of his conviction.

On the issue of whether or not there was a variance between the number of conspiracies charged and proved, we view the evidence in the light most favorable to the verdict. *United States v. Snider*, 720 F.2d 985, 989 (8th Cir.1983), *cert. denied*, 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984).

The record does not support a finding that a variance occurred, that is, that a single conspiracy was charged but more than one conspiracy proved. *See id.* Mondejar insists that a second conspiracy is evidenced by the fact there was testimony that Mondejar was not involved in one of the many drug deals that took place among several of the coconspirators. "Multiple groups and the performance of separate crimes or acts do not rule out the possibility that one overall conspiracy exists." *Id.* Here, the conspiracy, the agreement, was to engineer the distribution of cocaine in the Omaha, Nebraska, area. The conspiracy went on for some months, with coconspirators joining and dropping out throughout the duration of the conspiracy. The evidence showed that Mondejar was one of several sources of cocaine during the life of the conspiracy. Those sources were not necessarily known to each other, so by the same token a source's deals with the distributors and "mules" (couriers) were not necessarily known to the other sources. But that does not lead one to the conclusion that, each time a new source for cocaine joined the conspiracy, a new conspiracy was born. Distributors

and mules came and went, as well as sources, and did not necessarily know of each other's involvement in the overall scheme, but the overall illegal goal of the enterprise—to distribute cocaine in Omaha—never changed. The "common purpose" of the conspiracy "motivate[d] each participant and each act." *Id.* Mondejar's "nonparticipation in one of the many transactions undertaken as part of the single conspiracy's common plan does not demonstrate there was a variance between the indictment and the proof offered at trial." *United States v. Regan,* 940 F.2d 1134, 1135 (8th Cir.1991).

Because we hold there was no variance between the indictment and the proof at trial, we do not reach the question of whether there was such prejudice to Mondejar from the variance that reversal is required. Nor do we address the issue of whether the District Court should have given a multiple conspiracy instruction even though Mondejar did not request it.

### IV.

The District Court selected the base level for the sentences of all appellants based on a finding that the drug conspiracy of which they were convicted involved five to fifteen kilograms of cocaine. *See* United States Sentencing Commission, *Guidelines Manual,* § 2D1.1(a)(3), (c)(6) (Nov.1990). On appeal, Mondejar and both Pous challenge their sentences, claiming that too large an amount of cocaine was attributed to the conspiracy.

We will reverse for factual reasons the sentences imposed by the District Court only if we conclude that the factual findings upon which the court relied are clearly erroneous. 18 U.S.C. § 3742(e) (1988); *United States v. Lawrence,* 915 F.2d 402, 406 (8th Cir.1990) ("district court's determination of a quantity of drugs for sentencing purposes is … a factual finding subject to the clearly erroneous standard").

The appellants adopt slightly different theories for reversal, but the upshot of each is that there was insufficient evidence that the conspiracy dealt in five to fifteen kilograms of cocaine. Without any basis for his claim, William Pou says that the government witnesses testified to amounts of cocaine larger than those actually involved in an effort to please the government in light of their various plea and immunity agreements. Joseph Pou suggests that we evaluate the testimony of the government witnesses who testified as to the amounts of cocaine and find them not credible. Mondejar insists there was not proof by a preponderance of the evidence of his involvement with each of the amounts testified to, thus those amounts should not be attributed to him.

We decline the Pou brothers' invitations to review the credibility of the government witnesses and proceed from there to reverse the sentences. This Court is admonished to "give due regard to the opportunity of the district court to judge the credibility of the witnesses." 18 U.S.C. § 3742(e). There is nothing in the record that even suggests that it was error for the District Court to credit the testimony of the witnesses as to the amounts of cocaine involved in the conspiracy.

As for Mondejar's claim that he is being sentenced for quantities of drugs with which he was not personally involved, the evidence at trial indicated otherwise, showing his personal involvement with at least ten kilograms of cocaine. *See, e.g.,* Transcript at 498–99 (two kilograms), 509 (one kilogram), 512 (two kilograms), 514–15 (one kilogram), 1074–76 & 1085 (2 kilograms), 1116–17 (one kilogram), 1118–20 (one kilogram). In any event, each of the coconspirators may be charged with the amounts it was reasonably foreseeable the criminal conspiracy would handle. U.S.S.G. § 1B1.3(a)(1) & comment. (n. 1); *United States v. Payne,* 940 F.2d 286, 292 (8th Cir.1991), *petition for cert. denied,* —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (U.S.1991). The District Court did not specifically make such a finding here, presumably because it found by a preponderance of the evidence that Mondejar was personally involved in transactions dealing five to fifteen kilograms of cocaine. We conclude, however, that, were it necessary to attribute amounts of cocaine handled by the overall conspiracy to Mondejar in order to place him in the base offense level that the court did, it was reasonably foreseeable to Mondejar that the conspiracy in which

he was involved would be dealing at a minimum five to fifteen kilograms of cocaine.

The District Court gave all appellants the benefit of the doubt before attributing five to fifteen kilograms of cocaine to each; the evidence demonstrated that they easily might have been placed in the next higher category, fifteen to fifty kilograms of cocaine, for sentencing purposes. Sentencing Order at 3–4, *reprinted in* Appellants' Joint Appendix at 272–273. The District Court did not err in determining the base offense levels for the sentences of all appellants as it did.

### V.

▉ The District Court applied Guidelines section 2D1.1(b)(1) to adjust upward Joseph Pou's base offense level for possession of a dangerous weapon during the commission of a drug offense. Pou claims that the evidence linking his possession of a firearm (the possession itself evidently is undisputed) with an illegal drug transaction is insufficient and urges us to reduce his sentence accordingly.

We will reverse on this ground only in the face of clear error by the District Court. 18 U.S.C. § 3742(e). We find no such error.

▉ A firearm possessed by a convicted drug offender must be connected with the drug offense of conviction before its possession can be used to enhance his sentence. *United States v. Turpin*, 920 F.2d 1377, 1386 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991). Firearms were seen in Joseph Pou's apartment on more than one occasion, the same apartment from which cocaine was distributed. Transcript at 317, 1566, 1770–71. This connection between the weapons and Pou's drug offenses is more than adequate for us to hold that the District Court did not err in enhancing Pou's sentence based on possession of a firearm in connection with a drug trafficking offense. *See United States v. Green*, 889 F.2d 187, 189 (8th Cir.1989); *United States v. Wagner*, 884 F.2d 1090, 1098 (8th Cir.1989), *cert. denied,* 494 U.S. 1088, 110 S.Ct. 1829, 108 L.Ed.2d 958 (1990).

### VI.

▉ Under the authority of 28 U.S.C. § 1918(b) (1988), the District Court ordered each of the appellants to pay his share of taxable trial costs. As the final claim on appeal, the Pou brothers assert that the District Court erred in taxing the costs of trial to them because they were indigent at the time of sentencing. William Pou challenges the authority of the District Court to impose costs on an indigent defendant. Brief of William Pou at 20. The basis for Joseph Pou's claim is unclear; he simply says that the costs should not have been taxed. Brief of Joseph Pou at 23.

The authority of the court is clear from the plain language of the statute. The imposition of costs upon any defendant convicted of a non-capital offense is discretionary with the court: "Whenever any conviction for any offense not capital is obtained in a district court, the court may order that the defendant pay the costs of prosecution." 28 U.S.C. § 1918(b).

Both Pou brothers have cited *United States v. American Theater Corporation* for the proposition that it is the law of this Circuit that costs cannot be taxed against the indigent. 526 F.2d 48 (8th Cir.1975), *cert. denied,* 430 U.S. 938, 97 S.Ct. 1569, 51 L.Ed.2d 786 (1977). The Court therein did say that "the government has the right to tax the cost of prosecution to an unsuccessful, non-indigent defendant ... as long as it does so in a nondiscriminatory manner." *Id.* at 50. As noted by the Court, however, the issue of the defendant's indigence was not before it, *id.,* and this dicta cannot be converted into the affirmative law the Pous would prefer.

The court taxed costs with the amounts to be deducted from the appellants' prison earnings. Judgment Including Sentence Under The Sentencing Reform Act for Joseph Pou at 5, *reprinted in* Addendum of Joseph Pou at 30; Judgment Including Sentence Under The Sentencing Reform Act for William Pou at 5, *reprinted in* Addendum of William Pou at 27. We see nothing objectionable in imposing financial obligations upon convicted defendants who are indigent at the time of sentencing when it

reasonably can be foreseen that in the future they will have the wherewithal to discharge the obligation. *See United States v. Hutchings*, 757 F.2d 11, 14 (2d Cir.), *cert. denied*, 472 U.S. 1031, 105 S.Ct. 3511, 87 L.Ed.2d 640 (1985). Given the length of the prison terms the brothers will be serving, their prison wages should be more than enough to pay the costs taxed to each,[6] as well as their special assessments. The brothers will retain some monthly discretionary income and so will not be unduly burdened by having these amounts withheld from their wages. In any case, if the Pous are "unable, due to indigency, to pay these costs, the government simply would not be able to collect them, and it could not punish [the Pous] further for [their] inability to pay." *United States v. Tzakis*, 736 F.2d 867, 873 (2d Cir.1984). We hold that the assessment of costs against the Pous, notwithstanding their indigent status at the time of sentencing, was not an abuse of discretion.

The convictions and sentences of William Pou, Joseph Pou, and Miguel Mondejar are affirmed.

---

6. The total Bill of Costs is $2608.58, Addendum of William Pou at 30, and will be divided among the three defendants.